UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JOHNNY G. DeLOACH, ET AL.                    CIVIL ACTION

v.                                           NO. 10-724

HGI CATASTROPHE SERVICES, LLC, ET AL.        SECTION "F"

ORDER AND REASONS

Before the Court are the following cross-motions for summary judgment: (1) HGI Catastrophe Services, LLC's and Hammerman & Gainer, Inc.'s (the third-party plaintiffs') motion for summary judgment on the issue of Continental Casualty Company's duty to defend; (2) Continental Casualty Company's cross-motion for summary judgment; (3) Larry D. Oney's motion for summary judgment on the issue of Continental Casualty Company's duty to defend; and (4) Continental Casualty Company's cross-motion for summary judgment. For the reasons that follow, the third-party plaintiffs' and Larry Oney's motions are DENIED and Continental's cross-motions are GRANTED.

Background

These cross-motions concern a commercial general liability insurer's obligation to defend its insureds against a plaintiff's claims of reputational harm allegedly resulting from an unfulfilled potential employment arrangement.

The main dispute in this litigation arises from Johnny G.

1

DeLoach and his consulting firm's claims that HGI Catastrophe Services, LLC, and its member, Hammerman & Gainer, Inc., its president, Larry D. Oney (defendants), failed to honor an arrangement that plaintiffs -- experienced in the catastrophe services field -- would act as program director for the Road Home program, if the State of Louisiana awarded the defendants the project (which it ultimately did).

The State of Louisiana created and managed the Road Home program, which was funded primarily with federal money and was designed to help Louisiana residents impacted by Hurricanes Katrina and Rita get back into their homes. ICF International was awarded the first contract to administer the Road Home program; its three-year contract was to expire on June 11, 2009 and it was announced that the contract would not be renewed. Instead, public bids were solicited, and contractors were invited to submit bids on or before January 8, 2009. HGI Catastrophe Services, LLC (and its member, Hammerman & Gainer, Inc. and president Larry D. Oney) submitted its response to the State of Louisiana's request for proposal (RFP) on January 8, 2009.

Leading up to their RFP submission, at some point before January 7, 2009, HGI approached Johnny G. DeLoach and proposed that he serve as Program Director if HGI was awarded the Road Home contract. (DeLoach and his consulting company, DeLoach Consulting, LLC apparently have over 30 years of experience in disaster and

recovery operations).  Larry Oney discussed the terms of the potential agreement with DeLoach in which HGI would bid $200 per hour for DeLoach's time and efforts expended to secure the RFP, during the two month transition period, and during the 22-month performance period if HGI won the bid.  DeLoach was actively involved in the original bidding process and identified throughout HGI's submission as HGI's Program Director.[1]  DeLoach also traveled to Louisiana and participated in preparing for and delivering HGI's oral presentation on January 26, 2009 associated with its bid. Finally, HGI (and the other bid finalist, Shaw Group) were invited to make a Best and Final Offer on February 9, 2009, which DeLoach also participated in drafting and submitting to the State.

HGI won the bid; the State notified HGI that it would start transitional work on March 2, 2009 pursuant to the awarded contract.  A week later, a clerical worker for HGI orally informed DeLoach that HGI was continuing negotiations with the State, but that those negotiations did not include DeLoach in the role as Program Director.  The next day, on March 10, DeLoach emailed Larry

---

[1]As required by RFP protocols, HGI submitted DeLoach's commitment letter dated January 7, 2009 and his resume, which identifies him as an employee of HGI, identifies his role in the project as Program Management & Administration/Program Manager, identifies his availability as "onsite, 40 hours per week", and identifies his "duration of involvement" as "life of the project." In the Cost Proposal submitted to the State of Louisiana, HGI estimated the costs to be paid to DeLoach as the Program Director, if HGI secured the winning bid:  $768,000, which included hours devoted to the project during the transition period and then during the 22 months of the production period.

Oney, requesting an explanation.  Oney responded that same day, suggesting that the State objected to DeLoach's involvement in the project.  DeLoach contends that this is not accurate and complains that HGI secured the winning bid from the State because of DeLoach's involvement in the RFP process.

On March 1, 2010 Johnny DeLoach and JG DeLoach Consulting, LLC sued HGI Catastrophe Services, LLC, Hammerman & Gainer, Inc., and Larry D. Oney for breach of contract, fraudulent inducement, negligent misrepresentation, detrimental reliance/unjust enrichment, and unfair or deceptive trade practices.  The plaintiffs contend that, after securing the winning bid from the State, the defendants have earned millions of dollars on the ongoing contract, yet they have paid the plaintiffs nothing, not even out-of-pocket expenses associated with traveling to and from Louisiana during the RFP process.  The plaintiffs seek to recover the $768,000 for DeLoach's anticipated role as Project Manager (including during the RFP process and transitional phase), out-of-pocket expenses, as well as damages for missed business opportunities, lost profits, damage to DeLoach's professional reputation, restitution, treble damages, and reasonable attorneys' fees and costs.  The defendants answered the complaint on June 1, 2010 and then sought judgment on the pleadings in their favor as to the plaintiffs' breach of contract and fraudulent inducement claims.  On September 22, 2010 this Court denied the defendants'

4

motion.

One month later, the defendants -- Hammerman & Gainer, Larry Oney, and HGI Catastrophe Services -- filed a third-party complaint against Houston Casualty Company, asserting that HCC owes them defense and indemnity for claims that fall under the professional liability errors and omissions policy that HCC issued to the defendants.[2]  HCC denied coverage for indemnity and defense.  HGI Catastrophe Services and Hammerman & Gainer, and third-party defendant, Houston Casualty Company, filed cross-motions raising the issue of whether HCC has a duty to defend the third-party

---

[2]Houston Casualty Company issued an insurance policy to Hammerman & Gainer and HGI Catastrophe Services; the policy provides coverage for professional liability errors and omissions claims for the period August 1, 2009 through August 1, 2010.  The coverage grant of the policy, under Section "I", entitled "Coverage" provides:

> The Company shall pay on behalf of the Insured any Loss and Claim expenses...as the Insured acting in the profession described in Item 3 of the Declarations shall become legally obligated to pay for Claim or Claims first made against the Insured during the Policy period by reason of any Wrongful Act by an Insured....

An endorsement to the policy defines the Insured's "profession", for the purposes of Item 3 of the Declarations as: "...the performance of services as a Claims Adjuster and/or providing Appraisals and Catastrophe services, for others for a fee." Further, Section II of the policy defines a "wrongful act" as:

> ...any actual or alleged error or omission or breach of duty committed or alleged to have been committed or for failure to render such professional services as are customarily rendered in the profession of the Insured as stated in Item 3 of the Declarations.

plaintiffs in this matter pursuant to the professional liability policy.  On March 3, 2011 the Court determined that HCC had no such duty to defend HGI and Hammerman under the professional liability policy, and therefore denied the third-party plaintiffs' motion for summary judgment and granted HCC's Rule 12(c) motion for judgment on the pleadings.

Meanwhile, on February 11, 2011 the defendants filed another third-party complaint against Continental Casualty Company.  CCC issued a Commercial General Liability policy to Hammerman & Gainer; HGI is an additional insured on the policy, which also covered the corporation's officers, including the President/CEO Larry D. Oney. The coverage grant of CCC's CGL policy provides:

> 1.   Insuring Agreement
>
>      a.   We will pay those sums if the insured becomes
>           legally obligated to pay his damages because
>           of "bodily injury" or "property damage" to
>           which this insurance applies.  We will have
>           the right and duty to defend the insured
>           against any "suit" seeking damages for "bodily
>           injury" or "property damage" to which this
>           insurance does not apply.  However, we will
>           have no duty to defend the insured against any
>           "suit" seeking damages for "bodily injury" or
>           "property damage" to which this insurance does
>           not apply.

The CCC policy, of course, provides for certain exclusions; the policy states:

> This insurance does not apply to:
>      a.   Expected or Intended Injury
>           "Bodily injury" or "property damage" expected
>           or intended from the standpoint of the
>           insured.  This exclusion does not apply to

6

"bodily injury" resulting from the use of reasonable force to protect persons or property.

b.  Contractual Liability
"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:
(1)  That the insured would have in the absence of the contract or agreement;
\*\*\*

An additional coverage grant of the policy is provided under the provision Coverage B Personal Advertising Injury Liability, which states:

1.  Insuring Agreement
a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.
\*\*\*

This Personal Injury and Advertising liability provision, however, excludes coverage for:

...
f.  Breach of Contract
"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement."

Section V of the policy defines "personal and advertising injury":

14.  "Personal and advertising injury" means injury,

7

including consequential "bodily injury", arising out of one or more of the following offenses:
***

        d.   Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

In defining "property damage", the policy provides:

     17.  "Property damage" means:
        a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
        b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.[3]

The entire coverage grant of the CGL policy is modified by an employment-related practices exclusion endorsement, which provides that the policy does not extend coverage to bodily injury or personal and advertising injury to:

     (1)  A person arising out of any:
        (a)  refusal to employ that person;
        (b)  termination of that person's employment; or
        (c)  employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;
            ***
     This exclusion applies:
     (1)  Whether the insured may be liable as an

---

[3]And, "'[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

employer or in any other capacity; and
(2)  To any obligation to share damages with
     or repay someone else who must pay
     damages because of the injury.

The CGL policy also contains a General Liability Extension

Endorsement, which extends and limits coverage for personal and

advertising injury, including as follows:

15.  Expanded Personal and Advertising Injury

A.  The following is added to Section V –
    Definitions, the definition of "personal
    and advertising injury":
h.  Discrimination or humiliation that
    results in injury to the feeling or
    reputation of a natural person, but
    only if such discrimination or
    humiliation is:
         ***
(1)  Not done intentionally by or at the
     direction of:
     (a)  The insured; or
     (b)  Any "executive officer", director,
          stockholder, partner, member or
          manager (if you are a limited
          liability company) of the insured;
          and
(2)  Not directly or indirectly related to the
     employment, prospective employment, past
     employment or termination of employment
     of any person or persons by any insured.

The third-party plaintiffs and CCC, by way of cross-motions,

now seek summary judgment on the issue of CCC's duty to defend,

focusing their dispute on whether allegations of loss of reputation

constitutes property damage under the policy, thus triggering CCC's

duty to defend.

I.

9

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents do not qualify as competent opposing evidence.  Martin v. John W. Stone

Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987).  Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

II.

A.  Insurance Policy Interpretation

According to Louisiana law, an insurance policy is a contract that must be construed using the general rules of contract interpretation set forth in the Civil Code.  See Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 580 (La. 2003).  The Court's role in interpreting contracts is to determine the common intent of the parties.  La. Civ. Code art. 2045.  In determining common intent, pursuant to Civil Code article 2047, words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.  See Henry v. South Louisiana Sugars Co-op., Inc., 957 So.2d 1275, 1277 (La. 2007) (citing Cadwallader, 848 So.2d at 580).  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent" (La. Civ. Code art. 2046), and the agreement must be enforced as written.  Hebert v. Webre, 982 So.2d 770, 773-74 (La. 2008).  The Court's approach to a contract's meaning is driven by simple common sense principles.

11

Courts should not interpret insurance policies in an unreasonable or a strained manner so as to enlarge or to restrict policy provisions beyond what is reasonably contemplated by the terms or so as to achieve an absurd conclusion. South Louisiana Sugars Cooperative, 957 So.2d at 1277 (citation omitted). Unless it conflicts with state law or public policy, an insurance policy may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes. Id. at 1277-78 (citations omitted).

A policy provision that is susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. Civ. Code art. 2049. Further, the policy should be construed as a whole and one portion should not be construed separately at the expense of disregarding another. See La. Civ. Code art. 2050; see also Hebert, 982 So.2d at 774 (citations omitted).

If an ambiguity remains after the Court applies the general rules of construction, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage. Henry, 957 So.2d at 1278 (citing Cadwallader, 848 So.2d at 580). Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. Id. (citing Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co., 630 So.2d 759, 764 (La. 1994) and Garcia v. St.

Bernard Parish School Board, 576 So.2d 975, 976 (La. 1991)).  For the rule of strict construction to apply, the ambiguous insurance policy provision must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable.  Id. (citing Cadwallader, 848 So.2d at 580).

B.  An Insurer's Duty to Defend

"[I]t is well-settled that an insurer's duty to defend is much broader in scope than the insurer's duty to provide coverage." Elliott v. Continental Cas. Co., 949 So.2d 1247, 1250 (La. 2007)(citation omitted).  In determining whether an insurer has a duty to defend a suit brought against its insured, the Court looks to the allegations of the complaint and to the policy: "[a]n insured's duty to defend arises whenever the pleadings against the insured disclose even a possibility of liability under the policy." Id. (citations omitted); Selective Ins. Co. of Southeast v. J.B. Mouton & Sons, Inc., 954 F.2d 1075, 1078 (5th Cir. 1992)("The insurer's duty to defend is determined solely from the plaintiffs' pleadings and the policy, without consideration of extraneous evidence.").  "[I]f, assuming all of the allegations of the petition to be true, there would be both coverage under the policy and liability of the insured to the plaintiff, the insured must defend the insured regardless of the outcome of the suit." Elliott, 949 So.2d at 1250.

III.

13

The main dispute presented by the parties' cross-motions for summary judgment is whether the CCC policy potentially provides coverage for damage to DeLoach's professional reputation such that CCC is obligated to defend the third-party plaintiffs against DeLoach's claims.[4]  Putting a finer point on characterizing this dispute: whether a claim for reputational damage constitutes either "property damage" or "personal and advertising injury" that is not excluded under the CCC policy.

The Court turns to the DeLoach complaint and the CCC policy to determine whether CCC has a duty to defend the third-party plaintiffs.  The Hammerman parties do not suggest that CCC has a duty to defend them based on DeLoach's breach of contract claim, fraudulent inducement claim, or negligent misrepresentation claim. Rather, the Hammerman parties suggest that CCC is obligated to defend them because the DeLoach plaintiffs assert, in the alternative to the other claims, a claim for detrimental reliance/unjust enrichment and resulting loss of reputation damages.[5]  Because the parties dispute whether this Court should

---

[4]Larry Oney also raises other issues, which will be addressed as necessary.

[5]As alleged in Paragraphs 34 and 35 of the complaint:
...
       Defendants did not keep their promises to plaintiffs and breached the same without justification.    In  essence,  defendants, through the use of their false promises, used the  expertise  and  excellent  reputation  of JOHNNY G. DeLOACH to increase their chances of

follow two state appellate cases that favor Hammerman or two Fifth
Circuit Court of Appeals cases and one state appellate case that
favors CCC's position, this Court addresses the competing case law
in turn.

A.

In their moving papers, the Hammerman third-party plaintiffs
contend that the DeLoach plaintiffs have alleged loss of
reputation, which constitutes "property damage" as a matter of law,
that the CCC policy covers sums that the insured becomes obligated
to pay as damages because of "property damage", and, thus, that CCC
is obligated to defend them against the DeLoach suit.  In support
for its contention that loss of reputation constitutes property
damage as a matter of Louisiana law, Hammerman invokes <u>Lees v.
Smith</u>, 363 So.2d 974 (La.App. 3d Cir. 1978) and <u>Williamson v.</u>

---

winning the RFP from the state and providing
more than competent services to the
beneficiaries of the project; however,
defendants, through their false promises,
caused (either negligently and/or
intentionally) plaintiffs to devote
considerable time, effort, and their well-
earned and known reputation to benefit
defendants all to the detriment of plaintiffs.

As a result of defendants' false promises
and plaintiffs' detrimental reliance upon the
same, plaintiffs sustained damages in excess
of $768,000.00, including but not limited to
damages in the form of missed business
opportunities, lost profits, and damage to
plaintiffs' professional reputation.

Historic Hurtsville Ass'n, 556 So.2d 103 (La.App. 4th Cir. 1990).

In Lees, a neighbor sued a neighboring landowner, alleging false accusation of criminal conduct, abuse of process, and malicious prosecution; among the damages the neighbor sought to recover were damages for humiliation and mental anguish. Lees, 363 So.2d at 976-77. The defendant-landowner then sued, by way of reconventional demand, his neighbor for malicious prosecution and defamation, and also filed a third-party demand against his homeowner's insurer. Id. at 977. The state trial court held that the insurer owed no duty to defend Smith because Lees had not alleged "bodily injury" or "property damage" as those terms were used in the policy. Id. at 979. The state appellate court reversed, ruling that the insurer was obligated to defend Smith against Lees lawsuit. Id. at 980. The state appellate court reasoned that the policy's definition of "occurrence", which included an accident resulting in "bodily injury" or "property damage" was broad enough to cover a claim for defamation, or a loss to a person's reputation, and that the intentional act exclusion in the policy did not apply because the allegations in the petition were broad enough to include recovery based on the insured's negligence. Id. (noting that "[e]ven if the policy language was considered unambiguous, a person's reputation is his property,

perhaps the most valuable thing he possesses").[6]

Hammerman also invokes Williamson, in which the state appellate court relied on Lees in concluding that the defendant's insurer owed its insured a duty to defend her against a bar owner's suit alleging slander and defamation.  Williamson v. Historic Hurtsville Ass'n, 556 So.2d 103, 106-07 (La.App. 4th Cir. 1990). Williamson involved a dispute between a bar owner and the Historic Hurtsville Association's president.  Id. at 104.  George Williamson, who owned several bars in the Uptown area of New Orleans, intended to operate a college bar on property that he acquired on Magazine Street.  Id. That property was located within the jurisdiction of the Historic Hurtsville Association, which was headed by then-president Norma Burkhardt.  Id. The HHA through Ms. Burkhardt waged a spirited campaign before public bodies and within the courts to prevent the operation and renovation of a restaurant in the neighborhood.  Id. Williamson sued the HHA and Burkhardt in state court, alleging that she had slandered and defamed him in an

---

[6]One of the judges on the state court panel dissented from the court's ruling that the insurer was obligated to defend Smith, noting that:

> Smith is being sued for defamation.  There is no bodily injury involved in a defamation.  As to property damage, a suit for damages for defamation does not involve any injury to property.  I cannot accept the argument that a man's reputation is his "property" within the meaning and intent of the policy.

Id. at 981 (Culpepper, J., dissenting).

attempt to discredit his character and reputation and ruin his business. Id.[7] The state trial court granted summary judgment to Allstate and denied Ms. Burkhardt's motion for summary judgment, finding no duty to defend. Id. at 105. The state appellate court reversed.

In concluding that Burkhardt's insurer owed her a duty of defense against the Williamson slander and defamation suit, the state appellate court reasoned that the damages alleged in the bar owner's petition, including mental anguish, embarrassment, and suffering fell within the policy's definition of "bodily injury", and that allegation of loss of reputation and loss of profits fell within the policy's definition of "property damage". Id. at 106-08 (noting that Burkhardt's insurance policy defined "property damage" as "physical injury to or destruction of tangible property including loss of its use" and further noting that the Lees court determined that a person's reputation is his property).[8]

B.

CCC counters that more recent controlling case law casts doubt on the value of Lees and Williamson. Maintaining that its policy

---

[7]Williamson alleged in his petition that Burkhardt told residents and business owners that Williamson was bribing police officers to allow underage children to enter his businesses, Sidney's Bar & Restaurant and Audubon Tavern II. Id. at 106.

[8]The state appellate court finally determined that the policy's provision that excluded coverage for intentional acts did not apply because the tort of defamation may be accomplished through negligent acts. Id. at 108.

does not provide coverage for DeLoach's alleged loss of professional reputation because there is no claim of injury to tangible property, CCC invokes its policy's definition of "property damage", as well as three cases that have determined that purely economic losses do not constitute damage to "tangible property" and, therefore, fall outside of the scope of covered "property damage." The Court agrees.

In <u>Selective Ins. Co. of Southeast v. J.B. Mouton and Sons, Inc.</u>, 954 F.2d 1075 (5th Cir. 1992), the Fifth Circuit determined that an insurer had no duty to defend its insured because the complaint in the underlying litigation failed to allege "property damage" within the meaning of the policy.[9] In seeking defense from its insurer, Mouton had argued that the underlying Dupuis complaint

---

[9] <u>Selective Insurance</u> was a declaratory judgment action in which various insurers sought a declaration of that they were not obligated to defend their insured, Mouton; Mouton filed a third-party demand against yet another insurer, its CGL insurer, Valley Forge. <u>Id.</u> at 1076. The other insurers having settled their claims, Mouton argued that Valley Forge owed it a duty to defend it in the Dupuis litigation. <u>Id.</u> The Dupuis litigation involved a claim brought by a family and their trustee against a real estate developer and a general contractor (Mouton). <u>Id.</u> at 1076-77. The Dupuis family provided its land, partnering with the real estate developer for expertise in developing their land, in exchange for partnership interests. <u>Id.</u> Ultimately, the land was turned over to the mortgagee to avoid foreclosure. <u>Id.</u> The Dupuis plaintiffs alleged that Mouton, among others, was liable for Dupuis's loss of land and future income from the operation or sale of partnership property; the Dupuis complaint also asserted securities fraud, RICO claims, and various state law claims. <u>Id.</u> at 1077.

asserted claims for "property damage"[10]: Mouton maintained that the Dupuis plaintiffs' allegations that they lost land and income constituted damage to "tangible property" as defined by the policy. Id. at 1077.   The Fifth Circuit disagreed.   The Fifth Circuit noted that the first type of "property damage" covered by Mouton's policy was "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom." Id. at 1077.  The Fifth Circuit held that losses claimed by Dupuis, including a transfer of land, did not fall under this policy definition of "property damage", and no duty to defend was triggered.  Id. at 1078 (noting that Mouton failed to suggest how a transfer of land could constitute a "physical injury to or destruction of" the land).  The Fifth Circuit next determined that injury to a partnership interest was injury to intangible property and, thus, not covered under the policy.  Id. at 1078-79.  Likewise, the Fifth Circuit rejected Mouton's contention that Dupuis's other claims -- that rights to future income from the operation or sale of the property were lost

---

[10]   "Property damage" was defined in the policy as: (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
Id. at 1077.

-- alleged physical injury to tangible property.  <u>Id.</u>  at 1079 (injury in the form of lost profits and income is damage to incorporeal property; the complaint failed to allege the loss of use resulting from destruction of tangible property).

As to the second type of property damage covered by the Valley Forge policy -- "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use was caused by an occurrence during the policy period" -- Mouton argued that, even if the land was not injured or destroyed, the loss of use of the land was nonetheless covered because it was caused by an occurrence under the policy.  <u>Id.</u>   Rejecting this argument, the Fifth Circuit again determined that the alleged loss of use was not to tangible property, but only for loss of use of the intangible property (value of partnership interests), which was not covered under the definition of "property damage".  <u>Id.</u> at 1080.

CCC next invokes <u>Lamar Advertising Co. v. Continental Casualty Co.</u>, 396 F.3d 654 (5th Cir. 2005), in which the Fifth Circuit considered a CCC policy identical to the one at issue here, and rejected the state appellate court's conclusion in <u>Williamson</u> (that economic loss constituted property damage under a CCC policy identical to the one at issue here).  The Court paid homage to the <u>Selective Insurance</u> decision.  Lamar argued that the plaintiff alleged facts sufficient to trigger Continental's duty to defend under the policy's property damage or personal injury coverage

provisions.[11]  Id. at 658.  The parties agreed that the only loss
alleged in the underlying complaint was loss of future economic
benefits.  Id. at 660.  Lamar suggested that RAL's employees should
be considered property for the purposes of the insurance contract,
insisting that Williamson supported the conclusion that loss of
tangible property includes consequential economic losses resulting
from the loss or impairment of intangible property, including the
loss of future economic benefits such as those suffered by RAL.
See id. at 662-63.

In rejecting Lamar's invocation of Williamson, the Fifth
Circuit observed:

---

[11]Lamar provided advertising displays on billboards,
buses, and benches.  Lamar, 396 F.3d at 656-67. Continental issued
a CGL policy to Lamar, in which Continental agreed "to pay those
sums that the insured becomes legally obligated to pay as damages
[because of] property damage [or] personal injury to which this
insurance applies."  Id. Lamar demanded coverage when it was sued
in California (after Lamar had acquired other companies to expand
its business); the California suit concerned a contract dispute
between RAL Construction and Lamar's predecessors-in-interest.  Id.
at 656.  In acquiring its predecessors-in-interest, Lamar had
assumed their obligations, which included obligations owed to RAL
under a contract in which RAL was to be the exclusive provider of
maintenance and construction services to bus shelters owned by
Lamar's predecessors-in-interest.  Id. at 657.  RAL alleged that
Lamar breached the agreement by entering into new municipal
contracts without using RAL's services and by failing to use RAL on
existing contracts.  Id. In addition to a breach of contract
claim, RAL ultimately amended its complaint to include three tort
claims as alternatives to its breach of contract claim: intentional
interference with  contractual relations and with prospective
economic advantage and negligent interference with prospective
advantage for disparaging or demeaning RAL in a contract issue.
Id. The California suit settled, resulting in losses to Lamar.
Id.

> While it is true that in <u>Williamson</u>, the Louisiana Fourth
> Circuit Court of Appeal held that loss of profits
> constitutes injury to "tangible property," <u>see</u> 556 So.2d
> at 106, we find that the holding in <u>Williamson</u> does not
> compel us to depart from our most recent treatment of
> this issue in <u>Selective Insurance</u>.
>
> * * *
>
> The <u>Williamson</u> court considered neither the Louisiana
> Supreme Court's declaration that tangible property is a
> corporeal property nor any provision of the Louisiana
> Civil Code in reaching this conclusion.... Moreover, the
> <u>Williamson</u> court's broad interpretation of the term
> "tangible" would render meaningless the provision under
> Continental's policy agreeing to pay only those damages
> caused by physical damage to tangible property. Such an
> interpretation would make all damages recoverable under
> the policy. By contrast, this Court's interpretation of
> the terms tangible property as pronounced in <u>Selective
> Insurance</u>, is far more consonant with the language under
> Continental's policy and is consistent with Louisiana
> Civil Law methodology. Accordingly, we hold that loss of
> profits that do not flow from injury to tangible property
> is not a loss covered by this policy's property damage
> provision.

<u>Id.</u> at 663.[12] This Court echoes the Fifth Circuit's quite realistic

comments. Under the Fifth Circuit's analysis, it is clear that

DeLoach's claims for purely economic losses of in excess of

$768,000, resulting from missed business opportunities, lost

---

[12]In refusing to depart from <u>Selective Insurance</u>, the
Fifth Circuit noted:

> The doctrine of panel stare decisis requires
> in diversity cases that this panel adhere to a
> prior panel's interpretation of Louisiana law—
> "without regard to any alleged existing
> confusion in [that] state['s] law"—"in the
> absence of a 'subsequent state court decision
> or statutory amendment which makes this
> Court's [prior] decision clearly wrong.'"

<u>Id.</u> at 663 n.8 (citing <u>American Intern. Speciality Lines Ins. Co.
v. Canal Indemnity Co.</u>. 352 F.3d 254, 271 n.4 (5th Cir. 2003)).

23

profits, restitution, and damage to plaintiffs' professional reputation do not constitute loss of tangible property under the law of this Circuit and recent state appellate case law.[13]

C.

Hammerman maintains that Selective Insurance and Lamar Advertising were wrongly decided because they misapplied the concepts of tangible versus corporeal property. The Court disagrees.[14]

---

[13]CCC draws attention to a Louisiana state appellate court case more recently decided than Lees and Williamson, Massey v. Decca Drilling Co., Inc., 647 So.2d 1196 (La.App. 2d Cir. 1994), writs denied, 653 So.2d 563 and 564, as being in accord with Selective Insurance and Lamar:
     In Massey, the state appellate court, in overturning a jury verdict award of damages, held that an oil well operator's loss of mineral rights and future profit was not "property damage" within the meaning of the relevant insurance policies. Id. at 1205-06. Rather, such a loss could only be categorized as loss of intangible property. Id. at 1205 (noting that "'[t]angible property' has been equated with the civilian concept of 'corporeal property' by the Louisiana Supreme Court" (citing City of New Orleans v. Baumer Foods, Inc., 532 So.2d 1381 (La. 1988)).

[14]Hammerman simply concludes that "it is clear that the Fifth Circuit and the Louisiana Second Circuit Court of Appeal erroneously applied [Louisiana Supreme Court law]." Hammerman urges the Court to apply Lees and Williamson, insisting that the Court, sitting in diversity, is obligated to apply the substantive law of Louisiana. Hammerman's argument is unpersuasive and misses the mark: the case law invoked by CCC does in fact apply the substantive law of Louisiana by invoking the state high court's observations on the meaning of "tangible personal property." Indeed, the Fifth Circuit in Selective Insurance and Lamar Advertising observed that the Louisiana Supreme Court has, in fact, applied Louisiana property law concepts to the tax context. Hammerman's argument, however, seems to assume the reverse when they suggest that the Fifth Circuit has applied a definition of tangible property that the Louisiana Supreme Court meant to restrict (says Hammerman) to the tax context: Hammerman argues that

24

The Court agrees with the Fifth Circuit's analysis in
Selective Insurance and Lamar Advertising: the definition of
"tangible property" advanced by Williamson is unsound and
unreasonably broad, and betrays the insurance contract and
Louisiana property law.  A review of the allegations made in the
DeLoach complaint and the language of the CCC insurance policy
persuades the Court that the plain and unambiguous language of the
policy precludes coverage for the DeLoach plaintiffs' claims for

---

"[n]aturally, 'tangible property' as a general term used by parties
in contract and 'tangible personal property' as specifically
defined and applied in the respective tax codes are very
potentially two different things.  Accordingly, Hammerman asserts
that 'tangible property' as used by the parties in [this] case is
not restricted to the definition of corporeal property in La. Civ.
Code art. 461."  This argument seems to ignore the Louisiana
Supreme Court's observations: "The reasoning behind applying
property concepts in such a tax context is that the use of the
common law term "tangible personal property" by the
legislature...was intended to be interpreted consistently without
civilian property concepts embodied in the Civil Code."  South
Central Bell Telephone Co. v. Barthelemy, 643 So.2d 1240, 1243 (La.
1994).  Finally, Hammerman's result-oriented insistence that this
Court follow Williamson overlooks the Fifth Circuit's concern
articulated in Lamar Advertising that:

> the Williamson court's broad interpretation of
> the term tangible would render meaningless the
> provision under Continental's policy agreeing
> to pay only those damages caused by physical
> damage to tangible property.  Such an
> interpretation would make all damages
> recoverable under the policy.  By contrast,
> this court's interpretation of the terms
> tangible property as pronounced in Selective
> Insurance, is far more consonant with the
> language under Continental's policy and is
> consistent with Louisiana civil law
> methodology.

396 F.3d at 661-663.

purely economic losses (including the DeLoach plaintiffs' claim that they suffered damage to their professional reputations).  To repeat, claims for purely economic losses do not constitute loss of or damage to tangible property and, therefore, the claims asserted by the DeLoach plaintiffs fall outside the scope of coverage afforded Hammerman by the CCC policy.[15]

As to whether coverage is afforded by other provisions in the CCC policy, CCC maintains that the CCC policy does not provide coverage for loss of reputation, to the extent that it is defined as bodily injury or personal and advertising injury; that coverage is plainly excluded under the Employment Practices Exclusion, and the expanded personal injury definition.  (Hammerman does not even assert coverage based on these provisions in their motion for summary judgment).  Accordingly, in analyzing the scope of CCC's duty to defend the Hammerman third-party plaintiffs, the Court is persuaded that CCC has carried its burden to show that its CGL policy does not provide coverage to Hammerman for the DeLoach plaintiffs' claims.  Accordingly, the Hammerman third-party

---

[15]In addition to the case literature that impresses the Court: cf. Dugger v. Upledger Inst., 795 F. Supp. 184 (E.D. La. 1992)(even assuming that plaintiff asserting negligent misrepresentation claim had a colorable argument that he had a proprietary interest in his professional reputation, "that interest cannot be said to lie in 'tangible' property"), aff'd, 8 F.3d 20 (5th Cir. 1993); Innovative Hospitality Systems, LLC v. Abraham, --- So.2d ---, 2011 WL 1264601, at *3 (La.App. 3 Cir. 4/6/2011)("[t]he term 'tangible property' in such [CGL] policies carries the same meaning as the civilian term 'corporeal property'").

plaintiffs' motion for summary judgment is DENIED and CCC's cross-motion is GRANTED.

IV.

Turning to the cross-motions concerning CCC's duty to defend Larry D. Oney, again, a review of the CCC policy and the allegations of the DeLoach complaint preclude coverage. The Court has already determined that the CCC policy does not provide coverage for the DeLoach plaintiffs' attempts to recover for pure economic loss. However, Oney advances arguments particular to his status as an officer of Hammerman or HGI. Oney contends that: the Employment Related Practices Exclusion is inapplicable to him because he would not have been DeLoach's employer; as an officer of Hammerman or HGI, he is not excluded by the injury to employee exclusion; and officers and directors may be liable personally or in their official capacity.

Again, an insured's duty to defend arises whenever the pleadings against the insured disclose even a possibility of liability under the policy. CCC maintains that no such possibility arises here. The Court agrees.

First, CCC contends, Oney's assertion that he would not have personally employed DeLoach is irrelevant (1) in light of the exclusion's application "[w]hether the insured may be liable as an employer *or in any other capacity*" and (2) because, and to the extent that, the DeLoach plaintiffs allege that they are victims of

actionable employment-related practices. The Court agrees. The policy language is clear: the exclusion applies to bar coverage for any employment-related practices (including any refusal to employ), regardless of what capacity the insured may be held liable. Indeed, if the employment related practices exclusion was inapplicable to Oney, then the "in any other capacity" qualifier of that provision would be rendered meaningless.[16]

The DeLoach plaintiffs do not allege that Oney's actions resulted in bodily injury to them; CCC says that this dooms Oney's invocation of Canter v. Koehring Co., 283 So.2d 716 (La. 1973) -- in which a corporate officer or employee of a defendant corporation may be liable for injuries to third persons. Again, the Court agrees. Because the DeLoach plaintiffs do not assert bodily injury, Oney faces no possibility of Canter liability under the policy. See, e.g., Kling Realty Co., Inc. v. Chevron USA, Inc., 575 F.3d 510, 515 (5th Cir. 2009)("Canter liability to third persons for negligence of corporate officers and employees may only be imposed for bodily injury claims"); Unimobil 84, Inc. v. Spurney, 797 F.2d 214, 217 (5th Cir. 1986)(announcing bodily injury

---

[16]This is also in accordance with the policy's general liability endorsement, which expands "personal and advertising injury" to include humiliation that results in injury to the reputation of a person, and then limits it: "but only if such...humiliation is...not done intentionally by or at the direction of...the insured or any executive officer [or] director [and] not directly or indirectly related to employment [or] prospective employment...of any person or persons by any insured."

28

distinction: "Canter only applies to bodily injury claims and does not apply to claims arising in a commercial setting"); <u>Technical Resource Services, Inc. v. Shell Exploration & Prod. Co.</u>, No. 09-7399, 2010 WL 890533, at *3 (E.D.La. 2010).

Finally, Oney's suggestion that CCC owes him a duty of defense because of the potential of individual liability on his part is betrayed by the allegations of the DeLoach complaint: Oney points to no theory alleged in the DeLoach plaintiffs' complaint that is distinct from those allegations made against Hammerman, let alone under which Oney could be personally liable. Moreover, as already resolved, the DeLoach plaintiffs are seeking damages for economic loss, which does not trigger coverage under the CGL policy. Accordingly, Oney's motion for summary judgment is DENIED and CCC's cross-motion is GRANTED.

Because the CCC policy unambiguously excludes coverage for the DeLoach claims, CCC is not obligated to furnish a defense to the third-party plaintiffs, including Larry Oney. Accordingly, IT IS ORDERED: that the third-party plaintiffs' motion for summary judgment and Larry D. Oney's motion for summary judgment are DENIED and CCC's cross-motions are GRANTED.

New Orleans, Louisiana, June 20, 2011

MARTIN C. C. FELDMAN
UNITED STATES DISTRICT JUDGE